IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MALCOM S., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21cv0096 (RDA/JFA) |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 17, 20). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Appellate Operations ("Appeals Council") that plaintiff was not disabled as defined by the Social Security Act and applicable regulations.[1]

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 14). In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

1

# I. PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI initially alleging a disability onset date of December 15, 2017. (AR 258–70). The Social Security Administration ("SSA") denied plaintiff's applications on June 15, 2018. (AR 133–35). On June 22, 2018, plaintiff signed an "Appointment of Representative" form authorizing Andrew Mathis to represent him with respect to his claims. (AR 139). Plaintiff requested reconsideration of the denials on June 25, 2018, (AR 141), and the SSA affirmed its denial on September 17, 2018. (AR 142–55). On September 25, 2018, plaintiff requested a hearing before an ALJ. (AR 156–57). The Office of Hearings Operations acknowledged receipt of plaintiff's request on October 5, 2018, (AR 158–63), and scheduled a hearing before an ALJ for March 13, 2020. (AR 180–208).

On February 27, 2020, plaintiff withdrew his request for a hearing. (AR 211). On March 6, 2020, plaintiff's representative, Mr. Mathis, indicated that plaintiff wished to rescind the withdrawal of his request for a hearing. (AR 220). Mr. Mathis also stated that plaintiff had discharged him from representation.[2] *Id.* On March 13, 2020, ALJ George Gaffaney held a virtual hearing. (AR 37–48). Plaintiff appeared without representation and was granted a continuance to secure representation. (AR 41, 46). On March 16, 2020, plaintiff signed another "Appointment of Representation" form, again authorizing Andrew Mathis to represent him with respect to his claims. (AR 223). On June 3, 2020, the Office of Hearings Operations scheduled another hearing before ALJ Gaffaney for July 15, 2020. (AR 227–51). On July 14, 2020, plaintiff amended his alleged onset date of disability to April 1, 2020. (AR 297).

On July 15, 2020, ALJ Gaffaney held a second virtual hearing. (AR 49–74). Plaintiff appeared with Mr. Mathis as his representative. (AR 51). Plaintiff provided testimony and

---

[2] This was also reflected in a letter from plaintiff, dated March 4, 2020. (AR 218).

answered questions posed by the ALJ, a vocational expert, and his representative. (AR 54–66). The vocational expert also answered questions from the ALJ and plaintiff's representative. (AR 61–71). On August 18, 2020, the ALJ issued his decision finding that plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act from April 1, 2020 through the date of his decision. (AR 17–27). That same day, plaintiff sent a request for review of the ALJ's decision to the Appeals Council. (AR 254–57). On August 19, 2020, the Appeals Council granted plaintiff an extension of twenty-five (25) days to supplement his request for review. (AR 9–10). The Appeals Council denied the request for review on November 23, 2020, finding no reason under its rules to review the ALJ's decision. (AR 1–3). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 1); *see* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff was given sixty (60) days to file a civil action challenging the decision. (AR 2); *see* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff requested an extension to file his civil action on December 16, 2020. (AR 7–8).

On January 25, 2021, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On June 4, 2021, the parties filed a joint motion to set a briefing schedule for the parties' cross-motions for summary judgment, (Docket no. 15), which the court granted on June 21. (Docket no. 16). Plaintiff filed his motion for summary judgment on July 9, 2021. (Docket no. 17). The Commissioner filed her cross-motion for summary judgment on August 9, 2021. (Docket no. 20). The parties waived oral argument on their motions. (Docket nos. 19, 22). The case is now before the undersigned for a report and recommendation on the parties' cross-motions for summary judgment. (Docket nos. 17, 20).

## II. STANDARD OF REVIEW

Under the Social Security Act, the district court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted).  In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  It is the ALJ's duty, and not that of the reviewing court, to resolve evidentiary conflicts, and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

## III. FACTUAL BACKGROUND

### A.    Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1970 and was fifty years old at the time of the ALJ hearing on July 15, 2020.  (AR 66, 75).  Plaintiff completed high school.  (AR 66, 300).  From 2002 to 2003, plaintiff worked as a loader for Canada Dry Potomac Corporation.  (AR 280, 300).  From 2003 to 2005, plaintiff worked as a dialysis technician for Continental Dialysis Centers where he

4

helped clean dialysis machines and mix solutions for patients to use in cleaning their machines.[3]
(AR 62–64, 280–81, 300).  In 2006, plaintiff worked for Warehouse Home Furnishing
Distributors, Inc.[4]  (AR 281).  From 2007 to 2011, plaintiff again worked as a dialysis technician,
this time for Renal Treatment Centers Mid-Atlantic.  (AR 62–64, 281–82, 300).  From 2013 to
2014, plaintiff was self-employed.  (AR 282).  From 2014 to 2017, plaintiff worked as a sales
representative for Acosta Military Sales LLC.[5]  (AR 282–83, 300).  In 2018, plaintiff began
working as a motel desk clerk for Avanti Motel Group LLC, where he worked until shortly
before his alleged onset date of April 1, 2020.  (AR 55–56, 64–66, 283).

    **B.**    **Overview of Plaintiff's Medical History and Treatment[6]**

    A brief overview of plaintiff's medical history and a short summary of his treatment is
provided to give a framework for the more detailed discussion of plaintiff's medical issues and
claims that follows.  Plaintiff's medical history includes diagnoses of left leg below knee
amputation and peripheral neuropathy secondary to phantom limb syndrome.  (AR 392, 395,
570–71).  Plaintiff's medical history also includes diagnoses of pulmonary embolism, sciatica,
peripheral artery disease, deep vein thrombosis, cellulitis, hypertension, hyperlipidemia, anxiety,

---

[3] During this period, plaintiff also worked for several other dialysis clinics, including
DVA Renal Healthcare Inc. and Dialysis Clinic Inc.  (AR 280–81).  Plaintiff's earnings records
indicate that he also received income from Talcott Resolution Life Insurance Company and
McDonald Oil Co. Inc. *Id.*

[4] Plaintiff's earnings records indicate that he received income from Louis Berger Aircraft
Services Inc. in 2006 and 2007.  (AR 281).

[5] Plaintiff's earnings records reflect other smaller sources of income between 2012 and
2018.  (AR 282–83).

[6] The AR contains over 1,200 pages of medical records from various sources relating to
plaintiff's medical treatments.  This summary provides an overview of plaintiff's medical
treatments and conditions relevant to his claims and is not intended to be an exhaustive list of
every medical treatment.

depression, and disorder of left rotator cuff syndrome.[7]  (AR 392–93, 498, 707, 1227, 1349, 1594).

On December 6, 2017, plaintiff went to the Mount Vernon Hospital emergency department complaining of shooting and burning pain in his left foot.  (AR 738–39).  Plaintiff was examined, x-rays were taken, and a venous doppler ultrasound was performed.  (AR 741).  The x-rays revealed no fracture and the results of the venous doppler ultrasound indicated normal venous duplex of the lower extremities and no evidence of thrombus or obstruction to venous flow.  *Id.*  Given the test results, it was believed that plaintiff's foot pain may be related to nerve issues and sciatica given plaintiff's history of sciatic issues.  *Id.*  Plaintiff was discharged later that day and prescribed ibuprofen and lidocaine for pain management.  (AR 742).

On December 15, 2017, plaintiff went to the Alexandria Hospital emergency department experiencing throbbing pain in his left foot along with numbness and tingling.  (AR 635).  After imaging and a doppler ultrasound, the initial impression was arterial thrombosis and plaintiff was admitted for treatment.  (AR 639).  As noted by Dr. Papadouris on December 19, 2017, plaintiff received 72 hours of thrombolysis and pharmaco-mechanical thrombectomy of both the left peroneal artery and posterior tibial arteries.  (AR 716).  Plaintiff was diagnosed with diffuse small vessel occlusive disease within the foot due to prolonged ischemia.  *Id.*  At that time the viability of the foot was unclear, and plaintiff was to continue intravenous heparin for an additional 12 to 24 hours.  *Id.*  Plaintiff was discharged on December 20, 2017, with instructions to take certain medications, stop smoking, and to follow up with interventional radiology on December 27, 2017.  (AR 732–37).

---

[7] Plaintiff does not raise any claims on appeal relating to these diagnoses, so the following medical history focuses primarily on plaintiff's treatment relating to his below knee amputation and his phantom limb pain.

6

Plaintiff returned to Alexandria Hospital on December 24, 2017, with pain in his left foot and stated that his foot felt cold. (AR 629). Plaintiff reported that he had not been taking his anticoagulation medication as directed. (AR 633). Plaintiff was treated with morphine for the pain, he was given moderate intensity Heparin, and a doppler study was performed. *Id.* After discussing the options, plaintiff decided that he would return home and take his oral anticoagulants instead of being admitted. *Id.* The notes from this visit reflect that plaintiff has severe native small vessel disease with poor long-term prognosis and perhaps early necrosis in his 4th toes. *Id.*

On December 27, 2017, plaintiff was seen at the Cardiovascular & Interventional Radiology Department at Alexandria Hospital. (AR 624-28). Plaintiff reported that he continued to have pain in his foot with increasing intensity, he is only walking short distances with the assistance of a crutch, and that he has been compliant with his Xarelto medication since his December 24 emergency room visit. (AR 624). Given his condition, the appointment with a vascular surgeon was moved ahead to January 4, 2018. (AR 627). A January 5, 2018, note indicates that plaintiff failed to appear at the January 4, 2018 appointment. (AR 623–24).

On January 9, 2018, plaintiff returned to the Alexandria Hospital emergency department with complaints of pain and swelling in his left foot. (AR 498). Dr. Kapil Gopal conducted a surgical consult and reported that plaintiff had worsening gangrene and a history of embolization into his left foot. (AR 533–34). Plaintiff was prescribed Heparin, but his condition did not improve, and Dr. Gopal performed a left leg below the knee amputation on January 16, 2018. (AR 532, 550, 570–71). Shortly after his surgery, plaintiff reported phantom limb sensation. (AR 449, 457, 608).

7

Plaintiff was discharged from Alexandria Hospital on January 19, 2018 and began inpatient rehabilitation at Mount Vernon Hospital.  (AR 394–486).  Plaintiff completed his acute rehabilitation at Mount Vernon Hospital and was discharged on January 23, 2018, with the recommendation of continued home health therapy.  (AR 460–86).

On January 31, 2018, plaintiff had a follow-up appointment with Nurse Sandra Esset. (AR 1130–32).  Plaintiff had his immobilizer in place and was ambulatory with crutches.  (AR 1130).  Plaintiff reported that he was taking his Xarelto medication as prescribed.  *Id*.  Nurse Esset noted abscesses to both armpits secondary to use of crutches and prescribed Bactrim and advised to use warm compresses to the affected areas.  (AR 1131-32).  The surgical incision was healing with no redness, was not warm to the touch, and no drainage was noted.  (AR 1131). Plaintiff was placed back on gabapentin for his pain.  (AR 1132).

On February 8, 2018, plaintiff reported to Dr. Gopal that he had reduced left leg pain but that he was experiencing phantom limb pain.  (AR 1129–30).  Dr. Gopal instructed plaintiff to take gabapentin for the phantom limb pain.  (AR 1130).  Dr. Gopal noted that plaintiff was doing well enough that he could start doing prosthetic training and he was requested to return in six weeks.  *Id*.

On March 19, plaintiff saw his primary care physician, Dr. Michael Redding, and he complained that the gabapentin was no longer effective at mitigating his phantom limb pain.[8] (AR 1122).  Dr. Redding increased plaintiff's gabapentin dosage to three hundred (300) milligrams to be taken four times daily and prescribed him hydrocodone.  (AR 1123).

---

[8] Plaintiff made the same statement during a follow-up appointment with his prosthetics provider on March 14, 2018.  (AR 1299–1300).

8

In early spring 2018, plaintiff began to use a prosthesis. (AR 1118, 1297–98). Plaintiff experienced issues with the fit of his original prosthesis, which required that a new socket be recast and fabricated. (AR 1301–04). On May 21, 2018, plaintiff reported to his physical therapist, Masha Senic, that he had left knee pain and phantom limb pain and it was noted that plaintiff had limitations in left hip and knee range of motion, strength, and flexibility. (AR 1234–36). In June 2018, plaintiff reported improvement in walking and navigating stairs but indicated that he experienced continued soreness and tingling in his left leg. (AR 1253–63).

On June 14, 2018, Dr. Richard Surrusco, a non-treating state agency physician, filed his disability determination explanation for plaintiff's claims at the initial level. (AR 79–100). Dr. Surrusco noted that plaintiff had difficulty dressing, bathing, and preparing meals due to issues with balance and standing up for long periods. (AR 83, 94). Dr. Surrosco found that plaintiff had five severe impairments: hypertension, amputation (primary), thrombosis and hemostasis disorder, chronic infections of skin or mucous membrane, and peripheral arterial disease. (AR 84, 95). Dr. Surrosco determined that plaintiff was not disabled because, although his symptoms were severe, his limitations appeared "durational and resolving," and Dr. Surrosco estimated that he would be able to adapt to light work within twelve months of onset. (AR 85, 88–89, 96, 99–100).

On July 6, 2018, plaintiff saw Dr. Gopal for follow-up on his below knee amputation. (AR 1275). Plaintiff reported significant discomfort with his prosthesis. *Id.* Plaintiff also reported pain at the bottom and medial aspect of his stump, which he indicated was present before he was fit with the prosthesis. *Id.* Dr. Gopal indicated that there was nothing he could do about some of plaintiff's neuropathic pain because he was already on gabapentin. *Id.* In a medical source statement dated July 9, 2018, Dr. Gopal reported that plaintiff's level of pain was

moderate and that he had good credibility with regards to reporting pain. (AR 1246). Dr. Gopal anticipated that plaintiff would return to near normal ambulation but estimated that he could only sit for about two hours and could stand or walk for no more than an hour. (AR 1243–44). Dr. Gopal observed that plaintiff was incapable of using his left foot for pushing and pulling of leg controls. (AR 1244). Dr. Gopal estimated that plaintiff would require hourly rest periods when walking or standing, beyond what is allowed by most employers and that as a result of his medical needs he would be absent from work about three time a month. (AR 1246).

On July 10, 2018, plaintiff saw his prosthetist, Hans Wulf. (AR 1304–06). Mr. Wulf observed that plaintiff's limb had changed significantly in shape and volume since his previous casting. (AR 1304). Mr. Wulf noted that plaintiff was unable to walk for extended distances without pain or wear the prosthesis for more than four hours at a time. (AR 1305). Plaintiff received additional cushioning for his device but reported increased pain as a result of the modification. (AR 1266). Plaintiff was again cast for a replacement prosthesis. (AR 1306).

On July 16, 2018, plaintiff saw Dr. Redding. (AR 1248–51, 1356–60). In a medical source statement, Dr. Redding noted that plaintiff was experiencing chronic phantom limb pain along with pain and swelling due to poor prosthetic fit, despite repeated fittings. (AR 1248, 1359). Dr. Redding observed that plaintiff could sit for about two hours and that he could stand for no more than one hour and could walk no more than 100 feet without sitting. (AR 1249). Dr. Redding rated plaintiff's pain as moderate and his credibility with reporting pain to be good. (AR 1251). Dr. Redding indicated that plaintiff's disability was not likely to change and that he would require more than three absences from work each month as a result of his impairment and treatment. *Id.* Dr. Redding increased plaintiff's gabapentin prescription to four hundred (400) milligrams to be taken four times daily. (AR 1274, 1359–60).

On July 24, 2018, plaintiff received his new prosthesis. (1307–10). Soon thereafter, plaintiff observed cuts, blisters, and blood spots on his leg underneath the sleeve. (AR 1272, 1310). Plaintiff also indicated that he had difficulty with the fit of the new prosthesis due to swelling. (AR 1310). On August 1, 2018, Dr. Redding observed that the prosthesis was cutting into plaintiff's leg and causing painful blistering. (AR 1353–54). On August 13, plaintiff reported an improved comfort level (from 5/10 to 9/10) following adjustments to his prosthesis.[9] (AR 1334–36).

On September 14, 2018, Dr. Nicolas Tulou, a non-treating state agency physician, filed his disability determination explanation for plaintiff's claims at the reconsideration level. (AR 105–32). Dr. Tulou noted that plaintiff had difficulty walking more than very short distances but that he had recovered well and that his gait was within normal limits with his new prosthesis. (AR 111, 125). Dr. Tulou found that plaintiff had five severe impairments: hypertension, amputation (primary), thrombosis and hemostasis disorder (secondary), chronic infections of skin or mucous membranes, and peripheral arterial disease. (AR 111–12, 125–26). Taking into account these severe impairments, Dr. Tulou determined that plaintiff retained the residual functional capacity for light work and that he was not disabled. (AR 117, 131). Dr. Tulou found that plaintiff's impairments resulted in some limitations to his ability to perform work-related activities, but that they were not severe enough to keep him from working. (AR 118, 132).

On February 14, 2019, plaintiff saw Dr. Redding for ongoing pain due to the amputation. (AR 1344–45). Plaintiff's pain was categorized at a seven out of ten with burning that became worse at night. (AR 1345). Dr. Redding noted that plaintiff's prosthesis was fitting much better

---

[9] On November 28, 2018, plaintiff reported no pain or pressure with the prosthesis. (AR 1336–8).

and that the increased dosage of gabapentin was helping plaintiff's phantom limb pain. (AR 1347).

On April 24, 2019, plaintiff attended a follow-up appointment with his prosthetist, Melody Gordon. (AR 1339). Ms. Gordon observed that the liners of the prosthesis had ripped and that the gel was pulling away from the outside fabric, which allowed for bacteria to become trapped inside. *Id.* Plaintiff's suspension sleeve had also ripped, which contributed to "instability and unsafe ambulation." *Id.* Plaintiff reported increased pistoning and instability, which made it difficult to navigate uneven terrain at work and family functions. *Id.* Plaintiff noted that he had to wear the prosthesis less and reduce his daily activity. *Id.*

On June 17, 2019, plaintiff saw his prosthetist, Audrey Wood. Ms. Wood noted that plaintiff was unable to navigate environmental barriers at home or at work due to the poor fit and function of his prosthesis. (AR 1444). Ms. Wood also reported that plaintiff was an avid boater and fisherman and that he participated in these activities two to three times per month. (AR 1445). Ms. Wood observed that distal tibia breakdown and an ill-fitting socket had caused plaintiff significant discomfort and reported that any further adjustments would render the prosthesis unsafe and unsteady for use. *Id.* Ms. Wood noted that plaintiff was unable to perform regular duties at work (carrying anything or ambulating on rounds) due to worsening distal breakdown and debilitating pain. *Id.* Ms. Wood recommended a replacement socket for plaintiff. (AR 1448–49).

In June 2019, plaintiff was also referred to physical therapy for lumbar degenerative joint disease and sciatica. (AR 1414). Plaintiff reported numbness and tingling along his legs, and his

12

physical therapist noted that his back pain was possibly related to a leg length discrepancy from his prosthesis.[10]  (AR 1414–16).

On July 15, 2019, the socket on plaintiff's prosthesis became detached from the pylon. (AR 1449).  Plaintiff's prosthetist replaced and reinforced the fiberglass and finalized fabrication of the replacement socket.  *Id.*  On July 16, plaintiff reported to his physical therapist that he believed his change of multiple legs contributed to his spinal pain.  (AR 1424).

On September 20, 2019, plaintiff saw his prosthetist for a follow-up on his replacement socket.  (AR 1450).  Plaintiff reported improvement and indicated that he had no issues with the fit, pain, or alignment of the replacement socket.  *Id.*  On October 10, 2019, plaintiff saw Dr. Redding, and Dr. Redding reported that his condition relating to the below knee amputation was stable.  (AR 1573).

On May 6, 2020, plaintiff saw Dr. Redding for a pulled groin on his left side, and Dr. Redding reported that plaintiff's chronic phantom limb pain was stable on gabapentin.  (AR 1628–30).  On June 24, 2020, plaintiff saw his prosthetist for a follow-up appointment.  (AR 1632).  Plaintiff reported that he was experiencing minor suction issues due to a hole in the front of his sleeve.  *Id.*  Plaintiff also reported an increase in phantom limb pain.  *Id.*  The hole in the sleeve was sealed and plaintiff was given new socks, which allowed for suction.  *Id.*

### C.      The ALJ's Decision on August 18, 2020

The ALJ concluded that plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act based on his application for DIB and SSI for the amended alleged onset period of April 1, 2020 through the date of the decision, August 18, 2020.

---

[10] At a July 2, 2018 follow-up, plaintiff reported to his physical therapist that he had seen his orthotist, and his orthotist found that his leg length with the prosthesis was good.  (AR 1420).

13

(AR 26–27).  When determining whether an individual is eligible for DIB and/or SSI, the ALJ is required to follow a five-step sequential evaluation.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). It is this process that the court examines to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence.  *See id.*

The ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy.  *See id.*  The claimant bears the burden to prove disability for the first four steps of the analysis.  *See McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983).  The burden then shifts to the Commissioner at step five.  *See id.*  When considering a claim for DIB, the Commissioner must also determine whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  *See* 42 U.S.C. §§ 416(i), 423.  The regulations promulgated by the Social Security Administration provide that all relevant evidence will be considered in determining whether a claimant has a disability.  *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).

Here, the ALJ made the following findings of fact:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

(2) The claimant has not engaged in substantial gainful activity since April 1, 2020, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

(3) The claimant has the following medically determinable impairments: left lower extremity below knee amputation; peripheral neuropathy secondary to phantom limb syndrome; pulmonary embolism; peripheral artery disease; deep

14

vein thrombosis; hypertension; anxiety; depression; cellulitis; disorder of left rotator cuff; and hyperlipidemia (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

(4) The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

(5) The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2020, through the date of this decision (20 CFR 404.1520(c) and 416.920(c)).

(AR 19–26). The Appeals Council declined to review the ALJ's decision finding no reason to do so under its rules. (AR 1–3).

## IV. ANALYSIS

### A.    Overview

Plaintiff's motion for summary judgment argues that the ALJ's finding that plaintiff does not suffer from any severe impairments is not supported by substantial evidence. (Docket no. 18 at 8–9). Plaintiff's argument primarily focuses on the ALJ's finding that plaintiff's below knee amputation is not a severe impairment. Plaintiff first argues that the ALJ's finding that he can walk for an "unlimited amount" is not dispositive because plaintiff is limited by pain and fatigue. *Id.* at 12. Plaintiff's second argument is that the ALJ gave improper weight to a February 2020 mobility screening to find that plaintiff does not have issues with walking. *Id.* at 13. Plaintiff argues that the mobility screen—which indicated that plaintiff did not have serious difficulty walking or climbing stairs—was a "check-box" limitation that did not adequately provide narrative limitations. *Id.* Plaintiff's third argument is similar to his first, in that plaintiff argues that medical evidence that his phantom limb pain is stable due to treatment with gabapentin is not dispositive because plaintiff experiences other kinds of pain. *Id.* at 14–15. Finally, plaintiff

15

argues that the ALJ improperly rejected opinion evidence as outdated and inconsistent with the record. *Id.* at 15.

In response, the Commissioner argues that there is substantial evidence to support the ALJ's determination that plaintiff does not have a severe impairment. (Docket no. 21 at 9). The Commissioner argues that plaintiff failed to establish ongoing functional limitations either during the narrow period at issue or that would be likely to continue for twelve months. *Id.* at 9–10. The Commissioner maintains that there is no evidence of a severe impairment during the relevant period following the amended alleged onset of plaintiff's disability or immediately preceding it. *Id.* at 10–12. The Commissioner argues that plaintiff's reliance on medical opinions issued before the amended alleged onset is "wholly undermined" by the fact that plaintiff was working above the substantial gainful activity level when the opinions were acquired. *Id.* at 12. The Commissioner also argues that plaintiff's receipt of unemployment benefits conflicts with his claim for disability benefits. *Id.*

For the reasons discussed below, the undersigned recommends a finding that the ALJ's determination that plaintiff's below knee amputation is not a severe impairment is unsupported by substantial evidence. The undersigned recommends that the case be remanded for further consideration consistent with the Commissioner's five-step analysis of disability claims.

**B.      Plaintiff's below knee amputation is a severe impairment because it is likely to continue to limit significantly his ability to perform work-related tasks.**

The ALJ's finding that plaintiff's below knee amputation is not a severe impairment is unsupported by substantial evidence in the record. The ALJ found that plaintiff's impairments could reasonably be expected to cause his symptoms but found that plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence in the record. (AR 21). The ALJ found that plaintiff's below knee amputation was

16

not expected to significantly limit plaintiff's ability to perform basic work-related activities for twelve consecutive months. (AR 22–23). The ALJ relied on a review of systems conducted during a June 4, 2019 appointment with Dr. Redding to address plaintiff's anxiety and hyperlipidemia. (AR 22, 1550). The ALJ noted that plaintiff was negative for arthralgias and myalgias at the appointment and that he exhibited normal range of motion. (AR 22). The ALJ also relied on records from plaintiff's June 17, 2019 appointment with his prosthetist, Ms. Wood, for a replacement socket. (AR 22, 1444). The ALJ observed that plaintiff reported being an avid boater and fisherman two to three times per month, which required that he navigate up and down a dock, lift up to twenty-five pounds, balance on a boat, and traverse slippery surfaces. (AR 22, 1445). The ALJ cited Ms. Wood's evaluations that plaintiff's sensation and balance were unimpaired, that his gait was within normal limits, that his ability to ambulate with his prosthesis was unlimited, and that his left knee strength and range of motion were within normal limits. (AR 22–23, 1445–46). The ALJ also noted that a February 2020 mobility screening reflected that plaintiff did not have serious difficulty walking or climbing stairs. (AR 23, 1610–11).

Under the Commissioner's five-step process for evaluating disability claims, an individual's impairment is not severe if it does not "significantly limit" the individual's "physical or mental ability to do basic work activities." 20 C.F.R §§ 404.1520(c), 404.1522, 416.920(c). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1522(b)(1). A medically determinable impairment is not severe "only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

17

i.    *Plaintiff's challenges with his prosthesis have significantly limited his ability to participate in work-related activities.*

The administrative record does not support the ALJ's finding that plaintiff's below knee amputation poses only "minimal vocationally relevant limitations." (AR 23). The ALJ noted that plaintiff has had to return to his doctor to have "adjustments" made to his prosthesis, *id.*, but this understates the extent to which issues with his various prostheses have interfered with plaintiff's ability to navigate barriers at home and at work. Rather, plaintiff has repeatedly and consistently required medical intervention to address issues with the fit and function of the devices that have impacted his ability to walk long distances, navigate barriers, and carry items.

Plaintiff was fit with his first prosthesis on March 7, 2018, approximately two months after his amputation. (AR 1297–99). Less than two months later, plaintiff was recast for a new socket after his prosthetist determined that he was unable to fit in his first one. (AR 1301). On July 10, 2018, plaintiff's prosthetist observed that plaintiff's limb had changed size and that plaintiff was unable to wear the device for more than four hours at a time. (AR 1304–05). Plaintiff was then recast for his third socket in five months. (AR 1306). Soon thereafter, plaintiff again reported difficulty with his new prosthesis due to swelling, and Dr. Redding observed that the prosthesis was cutting into plaintiff's leg and causing blistering. (AR 1310, 1354). As of November 2018, plaintiff had adjusted to his prosthesis, and he reported no problems with the device. (AR 1337).

Plaintiff's issues with his prosthesis resurfaced again in early 2019. In April 2019, plaintiff's prosthetist observed that the liners of his prosthesis had ripped and that the gel was pulling away from the outside fabric, allowing for bacterial growth in the device. (AR 1339). The suspension sleeve had ripped as well, which contributed to "instability and unsafe ambulation" using the device. *Id.* At a June 2019 appointment, Ms. Wood observed that the

poor fit and function of plaintiff's device prevented him from navigating environmental barriers

at home and at work.[11] (AR 1444). As a result, Ms. Wood recommended that plaintiff be fitted

for a fourth socket. (AR 1444–49). Plaintiff again reported improvement after this replacement

and indicated that he had no issues with fit, pain, or alignment. (AR 1450).

As the ALJ noted, these events occurred prior to plaintiff's amended alleged onset date of

April 1, 2020. (AR 25–26). Plaintiff argues that they are nonetheless instructive because the

record "as a whole" documents plaintiff's ongoing functional restrictions.[12] (Docket no. 18 at

15). The duration of the issues and consistency of the opinions presented in the pre-onset record

help establish that plaintiff is likely to continue to face functional limitations for a twelve-month

period following onset. Although there are periods during which plaintiff is able to ambulate

effectively with his prosthesis, such periods are frequently interrupted by breakdowns, repairs,

and even full replacements of plaintiff's device. (AR 1301, 1306, 1449). These issues arose

consistently during the two years that plaintiff was using a prosthesis before his amended alleged

---

[11] The ALJ considered Ms. Wood's opinion that plaintiff was unable to traverse
environmental barriers, use a stepstool, use a ladder, or carry heavy objects, but found it
unpersuasive because it was inconsistent with the record, particularly Ms. Wood's own notes that
plaintiff was an avid fisherman and boater. (AR 26). While it is unclear what the note actually
means, whether plaintiff is able to fish or sail two to three times per month is not substantial
evidence that plaintiff's amputation does not limit his ability to perform basic work activities.
The relevant benchmark for the severity analysis is not the days when plaintiff is least affected
by his impairment, but rather the overall impact plaintiff's impairment has on his ability to work.
*See Schink v. Commissioner of Social Security*, 935 F.3d 1245, 1267 (11th Cir. 2019) ("[P]eople
with chronic diseases can experience good and bad days. And when bad days are extremely bad
and occur with some frequency, they can severely affect a person's ability to work.").
[12] The Commissioner argues that plaintiff's reliance on the pre-onset medical opinions is
undermined by the fact that plaintiff was working above the substantial gainful activity level
when they were issued. (Docket no. 21 at 12). That plaintiff was working before the alleged
onset date does not affect the severity analysis, which explicitly disclaims reliance on a
claimant's work experience. *See* 20 C.F.R. § 416.920(c). Plaintiff's receipt of unemployment
benefits, which the Commissioner argues is inconsistent with a disability claim, (Docket no. 21
at 12), is likewise irrelevant to a determination of whether plaintiff's impairments are severe.

onset date, and there is no evidence in the record that they have been resolved.  As plaintiff notes, he will continue to have difficulty ambulating because he has only one leg.  (Docket no. 18 at 13).

That plaintiff's struggles with the fit and function of his prosthesis are unlikely to be resolved within twelve months is supported by evidence in the record of issues arising *after* the amended alleged onset date.  On June 24, 2020, plaintiff saw his prosthetist about suction issues and a hole in the sleeve of his device.  (AR 1632).  The hole was temporarily sealed, and plaintiff was scheduled for a follow-up a month later.  *Id.*  At the July 15, 2020 hearing before the ALJ, plaintiff testified that he cannot walk long distances due to the prosthesis and that he frequently has to remove it due to chafing and irritation of his skin.  (AR 58–60).  Plaintiff indicated that his frequent visits with the prosthetist interfered with his work due to his leave requirements.  (AR 61).  Plaintiff further testified that he intended to return to the prosthetist after the hearing to have them "try to redo" the prosthesis.  (AR 59).

Since acquiring his prosthesis, plaintiff has repeatedly and consistently required medical intervention to address issues with the fit and function of the devices.  Nearly two and a half years of medical records and testimony reflect that plaintiff's prosthetic devices for his below knee amputation require ongoing care and maintenance.  For this reason, there is not substantial evidence in the record that plaintiff's impairment is only a "slight abnormality" with "minimal effect" on his ability to work.  *See Evans*, 734 F.2d at 1014; *see also* 20 C.F.R §§ 404.1520(c), 404.1522, 416.920(c).

     ii.     *Plaintiff's below knee amputation and issues with prosthetic fit have been a consistent source of pain for plaintiff.*

The severity of plaintiff's impairment due to his below knee amputation is further exacerbated by the frequent and recurring pain that he experiences due to issues with the fit of

the prosthetic devices and peripheral neuralgia associated with phantom limb syndrome. The ALJ noted that plaintiff's phantom limb pain was stable on gabapentin and that Dr. Redding reported that plaintiff appeared well-developed and well-nourished during a May 6, 2020 video visit. (AR 23, 1628–1629). Considering the administrative record as a whole, there is sufficient objective medical evidence to support plaintiff's claim that he suffers from various forms of pain and discomfort as a result of his below knee amputation. *See Craig v. Chater*, 76 F.3d 585, 591 (4th Cir. 1996).

Plaintiff's issues with the fit of his prosthesis have frequently manifested in pain and discomfort. Shortly after he was fit with his first prosthesis, plaintiff reported irritation at the distal end of his tibia. (AR 1300). On July 6, 2018, Dr. Gopal noted that plaintiff was experiencing significant discomfort with his prosthesis. (AR 1275). Plaintiff reported issues with his leg slipping through the prosthesis, which caused the stump to hit it while walking. *Id.* Plaintiff also experienced swelling in his leg, which interfered with the fit of his prosthesis and caused him pain. (AR 1248, 1275). On July 10, 2018, plaintiff noted increased pressure at his distal anterior tibia and distal limb and his prosthetist observed slight redness. (AR 1304). Plaintiff reported that he was unable to walk extended distances without pain. (AR 1305). Plaintiff's prosthetist added cushioning, but plaintiff reported increased pain as a result. (AR 1266). After plaintiff received his replacement prosthesis, he reported cuts, blisters, and bloodspots. (AR 1272, 1310, 1354). During an April 2019 evaluation, plaintiff's prosthetist observed that the deterioration of plaintiff's suspension sleeve put him at risk for skin breakdown, falls, and associated injury. (AR 1339). These issues continued into June 2019, when plaintiff's prosthetist noted that distal tibia breakdown and an ill-fitting socket were causing plaintiff significant discomfort. (AR 1445). Plaintiff's prosthetist reported that

21

plaintiff's distal breakdown was worsening and that the pain "debilitated him" ambulating to and from work. *Id.* Plaintiff also began experiencing back pain and his physical therapist indicated that it could have been caused by a leg length discrepancy in the prosthesis. (AR 1414).

The administrative record also provides ample support for the conclusion that plaintiff suffers from frequent and recurring phantom limb pain. On February 8, 2018, plaintiff reported to Dr. Gopal that he was experiencing phantom limb pain. (AR 1130). Dr. Gopal recommended that plaintiff take gabapentin to manage his pain. *Id.* On March 19, plaintiff reported to his primary care provider, Dr. Redding, that the gabapentin was no longer effective, and Dr. Redding increased the dosage from one hundred (100) milligrams to three hundred (300) milligrams, to be taken four times daily. (AR 1122–23). Plaintiff continued to experience phantom limb pain, as reported to his physical therapist on May 21. (AR 1234). At plaintiff's appointment with Dr. Gopal on July 6, plaintiff complained of residual neuropathic pain at the base and medial aspect of the stump. (AR 1275). Dr. Gopal explained to plaintiff that there was nothing that could be done about some of his neuropathic pain because he was already taking gabapentin. *Id.* On July 16, Dr. Redding again increased plaintiff's gabapentin dosage to four hundred (400) milligrams to address plaintiff's phantom limb pain. (AR 1359). On February 14, 2019, plaintiff saw Dr. Redding and reported burning pain at an intensity of seven out of ten that worsened at night. (AR 1345). On May 6, 2020, Dr. Redding reported that plaintiff's phantom limb pain was "stable" on the fairly high dose of gabapentin he has prescribed (AR 1630), but that does not mean plaintiff's ability to perform work related activities is not significantly limited by pain. Furthermore, plaintiff reported increased pain to his prosthetist on June 24, 2020. (AR 1632).

Plaintiff's difficulties with his prosthesis and the accompanying pain and discomfort due to poor fit and phantom limb pain are substantial evidence that plaintiff's below knee amputation is a severe impairment.  Indeed, both of the state non-treating physicians that reviewed plaintiff's disability claims found that his impairments were severe but that he would be able to sustain residual functional capacity sufficient to engage in light work.  (AR 83–84, 94–95, 111, 125).

It is important to note that this report and recommendation is limited to a determination that plaintiff's below knee amputation should be considered a severe impairment at step two of the required analysis.  What is not considered here is whether any of plaintiff's impairments meet or equal one of the enumerated listings, whether plaintiff has the residual functional capacity to perform past work, or whether plaintiff has the residual functional capacity to perform other work within the national economy.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  Those prongs of the Commissioner's five-step evaluation would be within the ALJ's consideration on remand and, following that consideration, the ALJ may find that plaintiff is able to perform his past relevant work or other work in the national economy and therefore is not disabled.  Nevertheless, the ALJ's decision currently before the court that plaintiff's below knee amputation would not have a significant limitation on his ability to perform some work-related activities is not supported by a considered review of the entire administrative record.

## V. CONCLUSION

Based on the foregoing, the undersigned recommends that the Commissioner's final decision denying benefits for the period of April 1, 2020 through the date of the ALJ's decision on August 18, 2020 be remanded for further consideration.  Accordingly, it is recommended that plaintiff's motion for summary judgment (Docket no. 17) be granted in part; the Commissioner's

motion for summary judgment (Docket no. 20) be denied; and the final decision of the Commissioner be remanded for further consideration.

## NOTICE

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 12th day of October, 2021.

/s/
John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia